1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :    Case No. 1:18-mj-402
                              :
                              :
BYRAMJI M. JAVAT,             :
              Defendant.      :
                              :
------------------------------:
```

DETENTION HEARING

August 22, 2018

Before:   Theresa C. Buchanan, U.S. Mag. Judge

APPEARANCES:

Jason A. Reding, Counsel for the United States

Gregory S. Smith, Counsel for the Defendant

The Defendant, Byramji M. Javat, in person

2

1          NOTE:  The case is called to be heard at 2:05 p.m. as

2    follows:

3          THE CLERK:  The United States versus Byramji Moneck

4    Javat, case 18-mj-402.

5          MR. REDING:  Good afternoon, Your Honor.  Jason

6    Reding for the United States.

7          MR. SMITH:  Good afternoon, Your Honor.  Greg Smith

8    representing Mr. Javat.

9          THE COURT:  Good afternoon.  All right.  And this is

10   on for a Rule 5 -- excuse me, it is on for the detention

11   hearing.

12          And did you want to proceed with that today, counsel?

13          MR. SMITH:  Yes, Your Honor.

14          THE COURT:  All right.  Does the Government have

15   anything to present, any evidence to present as to detention?

16          MR. REDING:  Yes, Your Honor.  Before we start, I

17   would like to correct the record.  I mistakenly said all

18   counts -- on Monday I mistakenly said all counts had a maximum

19   sentence of 20 years.

20          THE COURT:  Okay.

21          MR. REDING:  Counts 1 through 4 have a maximum

22   sentence of 20 years.  And Counts 5 through 7 have a maximum

23   sentence of 15 years.

24          THE COURT:  Okay.  Did you have any witnesses you

25   wanted to call as to detention?

1          MR. REDING:  Your Honor, I propose that we can

2    proffer the facts.  But we do have a witness available, Special

3    Agent Justin Fieldler.

4          THE COURT:  Do you have any objection to a proffer,

5    counsel?

6          MR. SMITH:  Your Honor, on reflection, I think I

7    would ask that the witness be called.  Unless the Court wants

8    to proceed by proffer.  And if you do, we will defer to the

9    Court.

10          THE COURT:  I think it's -- we're not doing a

11    probable cause hearing.  I think it's just as easy to have a --

12    to not have testimony on detention, just to proceed by a

13    proffer, if it's okay with you.

14          MR. SMITH:  If the Court's preference is proffer, we

15    will not object to that, Your Honor.

16          THE COURT:  Okay.

17          MR. REDING:  Your Honor, this may take a little bit

18    because it's a complicated fraud scheme.

19          The charges are conspiracy to commit wire fraud,

20    three counts of wire fraud, conspiracy to obtain pre-retail

21    medical products by fraud and deception, and two counts of

22    theft of pre-retail medical products.

23          Using a conservative estimate of $3.5 million of

24    loss, the Government believes it's actually somewhere around

25    the -- around $20 million of fraud.

4

1          The defendant is looking at a Guideline sentence of

2     108 months to 135 months.  78 months to 97 months with

3     acceptance.  I can go through that calculation, just to go to

4     the severity of the sentences --

5          THE COURT:  No, I don't need the calculation.

6          MR. REDING:  The -- the case involves a fraud

7     conspiracy, which the goal was to defraud numerous victim

8     companies by selling the defendant their consumer products,

9     including pre-retail medical products, at a deeply discounted

10    rate not available to U.S.-based wholesalers.

11         The defendant would obtain those discounted prices by

12    telling the victim companies that the products were to be

13    shipped and used abroad, specifically in the Middle East.

14    Often times the defendant -- defendants would claim that the

15    products would be provided to U.S. military abroad.  Which was

16    a factor for some of the victim companies to provide the

17    discounted rates.

18         This was a ruse.  The defendants were taking the

19    discounted products and reselling them in the United States at

20    a significant profit.

21         The fraud scheme typically involved an e-mail pitch

22    where a co-conspirator on behalf of the front company would

23    introduce their company as a legitimate business and would tell

24    the victim company that it was soliciting bids for products to

25    be provided to the Middle East, sometimes to the United States

1    military abroad.

2         Based on these representations and after some

3    negotiation, the victim companies would agree to provide their

4    products at deeply discounted rates with the understanding that

5    the products would be provided solely for export purposes.  In

6    fact, some of the victim companies' invoices explicitly stated

7    that the prices provided were contingent on the buyer's

8    representation that the merchandise would be exported and any

9    sale of the product in the United States would constitute a

10   fraud.

11        Unbeknownst to the victim companies, however, the

12   products were never used in the Middle East or for the U.S.

13   military.  Rather, while the defendants were negotiating with

14   victim companies they were simultaneously negotiating the sale

15   of the victim companies' products to wholesalers in the United

16   States for a significant profit.

17        In order to perpetuate this fraud and to show that

18   the items were exported, the defendant either rerouted the

19   shipment back to the United States or they had their own people

20   pick up the products, take them to a U.S. warehouse, and then

21   generate false export documentation.

22        As part of the investigation, law enforcement

23   obtained e-mail search warrants which confirmed the fraud

24   scheme of various individuals involved and their representative

25   roles.  These warrants reveal the defendant was the organizer

1   of the fraud scheme.  The e-mails obtained, among other things,

2   show he directed various co-conspirators on what to do,

3   sometimes telling them exactly what to say to victim companies

4   when they would give any push-back to the fraudulent pitch, was

5   consulted on what was happening with each victim company.

6   Sometimes he would introduce himself to the victim company

7   representatives as the owner of the soliciting company.  And

8   lastly, he directed -- directly negotiated U.S.-based

9   wholesalers for the sale of the victim company products.

10         The fraud involved numerous interstate and foreign

11   wire transfers and e-mails.  The investigation has revealed

12   approximately $20 million in proceeds were received by the

13   defendants, much of which has been wired outside of the United

14   States.

15         Shipping records obtained confirmed that -- the

16   importation of numerous diverted shipments through Miami either

17   from the Port of Miami or Miami International.

18         Your Honor, that covers the basic fraud scheme.  For

19   the detention factors, the Government points to the nature and

20   circumstances of the offense charged, the weight of the

21   evidence against the defendant, and the history and

22   characteristics of the defendant.

23         The weight of evidence against the defendant is

24   significant.  There are e-mails from the defendant directing

25   and instruction of the fraud.  There are PowerPoint slides

1  instructing subordinates how to conduct the fraud, the

2  financial transactions supporting the fraudulent transactions,

3  and witness testimony from victim companies.

4        We believe that the defendant is a significant flight

5  risk to return because the defendant is looking at some

6  significant charges and times.

7        The weight of the evidence.  The defendant was the

8  organizer of the elaborate fraud scheme over a number of years

9  involving millions of dollars.

10        As I say before, if convicted, he is looking at a

11  significant prison sentence.  And, therefore, he has a

12  significant incentive to flee.

13        He has minimal contacts in the United States.  He is

14  not a United States citizen.  He is a citizen of Pakistan and a

15  citizen of Saint Kitts.  He only has visits to the country for

16  a few days at a time a few times a year.  He is a resident of

17  the UAE, which has no extradition treaty with the United

18  States.

19        And although his passports, his two passports have

20  been seized, given the defendant's vast financial wealth, which

21  I believe is not outlined accurately in the presentence report,

22  his ability to flee easily I think is apparent.

23        Your Honor, I can go -- I can outline some of the

24  specific instances of the presentence report that we feel do

25  not accurately reflect his financial resources, if you would

1   like.

2          THE COURT:  All right.  All right.

3          MR. REDING:  So he claims a residency here in -- or

4   an apartment here in D.C. of 2501 Pennsylvania Avenue,

5   Northwest, apartment 5C.  He states to Probation that he lives

6   there, he can live there rent free.

7          While I only had an hour to review this presentence

8   report, basic Internet research shows that the apartment is

9   valued -- last sold for $2.3 million in March of 2016.  It

10  looks like it's owned by a shell corporation or a trust.

11         In addition, he states in his -- he states to

12  Pretrial Services that his company rents his warehouse in

13  Georgia.  That a warehouse was recently listed for $7 million

14  and it's owned by one of his subsidiary companies.  He states

15  in Probation that he -- he owns Uniworld FZE.  And if you check

16  the company Web site, which I can provide printouts of the

17  company Web site to the Court and defense counsel, one of the

18  wholly-owned subsidiaries of Uniworld is Proton.  Proton is the

19  owner, according to County tax records, of this warehouse

20  property which recently listed for $7 million.

21         The Government --

22         THE COURT:  All right.

23         MR. REDING:  -- has nothing further on detention.

24         THE COURT:  All right.  Thank you.

25         Do you have argument?

1         MR. SMITH:  Your Honor, let me start with the

2    comments made at the end.  I was present during the Pretrial

3    interview.  It was not a presentence interview, obviously.

4    Pretrial asked him what he personally owned in the United

5    States.  And the descriptions that he gave were answering that

6    question, what he owned in the United States.

7         Jason has talked about other items that may have been

8    owned by other people, and let's address those.  The apartment,

9    he says it's worth a lot of money and it's owned by what he

10   says is a shall company or a trust.  Well, my client told the

11   Pretrial officer it's owned by a trust.

12         THE COURT:  I saw that.

13         MR. SMITH:  There is no hiding of the ball here.  And

14   that trust does give -- would give him the permission to stay

15   there free.

16         In terms of the renting of the warehouse and the

17   ownership.  Again, the fact that his company may have a

18   subsidiary that owns the warehouse is not something that was

19   asked nor was it discussed because it is not something he

20   personally owns.  It is a subsidiary of a company, and that is

21   a question that was simply not asked.

22         He was accurate and truthful in the information he

23   gave across the board.  The Pretrial officer certainly had no

24   disagreement with any of it.

25         And so, I wanted to start there by -- I mean, the

1   suggestion that somehow he wasn't truthful is just not so.

2          Let me turn to a couple of the other things.  And we

3   are going to want to call some witnesses --

4          THE COURT:  I don't usually hear witness testimony.

5   Why would I need to hear witnesses?  I've got the third-party

6   custodians here in the report.

7          MR. SMITH:  Well, Your Honor, I think Salerno, the

8   Supreme Court case, gives us the ability to call witnesses at a

9   detention hearing.

10         THE COURT:  What are they going to add beyond what's

11  in the Pretrial report?

12         MR. SMITH:  They are going to tell you how they know

13  him -- there is an allegation that's been made by Jason just

14  now that he does not have strong community contacts, and we

15  want to establish that he does.  The way to do that is --

16         THE COURT:  Well, I see he has several friends,

17  certainly.  And he has two children in the area who go to

18  school.

19         MR. SMITH:  Yes.

20         THE COURT:  I understand that.

21         MR. SMITH:  And who those people are and the nature

22  of how long they've known him and what their relationship is I

23  think is important for the Court to hear.

24         Before I get into that, quickly, if I might --

25         THE COURT:  I guess -- well, I'll come back to that

1    in a minute.

2              MR. SMITH:  Okay.

3              THE COURT:  Okay.  Because I'm not sure that it's --

4    and I can accept your representations as to how they know him.

5    I don't need to have testimony about it.  But if you want to

6    make a proffer as to that, I accept that.

7              I am not sure that it affects the fundamental

8    concerns that I have even if he does have several contacts here

9    who can vouch for him.  And maybe go to that because maybe it

10   would help.

11             The problem that I have got is that in addition to

12   this alleged fraud appearing to be significant and extensive,

13   as far as his contacts and possible third-party custodians are

14   concerned, his wife is only legally here until November.  She

15   wants to go back -- be able to go back to Dubai with the

16   daughter.  Understandable, but that doesn't help the situation.

17             So, effectively, she can't be a third-party custodian

18   for him because of those problems even if I were -- even if she

19   were to agree to not go to Dubai, the fact that she is only in

20   the States legally, at least now until November, is a big

21   problem.

22             The other -- all of the other third-party custodians

23   have got problems in terms of their ability to supervise the

24   defendant.  And I know that at least one offered a secured

25   bond.  I don't think it's of an amount that is enough, to begin

1   with.

2          But as far as these people, even if they are totally

3   suitable third-party custodians, and I don't doubt that they

4   are, understandably because of their own personal situations I

5   don't see how they can effectively supervise this defendant in

6   a way that would give me any confidence that he is going to

7   appear.

8          The issue here is certainly not danger to the

9   community.  The only issue here is -- is risk of non-appearance

10  or flight.

11         And to get to the crux of the matter, I guess in

12  terms of your argument, what I need to understand from you is

13  how I'm going to possibly ensure that he would be able to do

14  that.

15         The other issue is the defendant is actually charged

16  in the Southern District of Florida.

17         MR. SMITH:  Right.

18         THE COURT:  And I don't see anything that would help

19  me in terms of him residing with anybody in Florida.  Normally

20  we don't have people live somewhere other than where they are

21  charged unless they, you know, are a U.S. citizen and have

22  extensive ties.

23         But this is not very feasible to have him live

24  anywhere other than in Florida in terms of concerns of travel

25  back and forth.  I don't even know how he would do that unless

13

1   he drove.  I mean, that's just not -- it's very problematic.

2            MR. SMITH:  Well, he could have a custodian with him

3   when he goes.  But let me, let me back up and try to go through

4   my arguments.  I take the Court's --

5            THE COURT:  Okay.

6            MR. SMITH:  -- concerns, and let me try to address

7   them.

8            THE COURT:  I was just trying to focus us here on --

9   you know, I accept that he has got several people here who

10  would vouch for him, who know him, who have known him for a

11  while, who seem to be fine, upstanding citizens in this area.

12  That doesn't address my concern though.

13           So, I mean, if you want to put those people on, I

14  will allow you to, but I don't think it's going to go to the

15  crux of the matter, and I would accept your representations as

16  to them.

17           MR. SMITH:  I appreciate that, Your Honor.  Let me --

18  let me try to go through some of your points and then we can

19  maybe address that at the end.

20           THE COURT:  Okay.

21           MR. SMITH:  Let me start by discussing a few legal

22  principles that are familiar to you, I'm sure, but worth

23  repeating.  Your options are, obviously, release on personal

24  recognizance or release on a condition or combination of

25  conditions for detention.

14

1          THE COURT:  Correct.  I am well aware of that.

2          MR. SMITH:  Release is appropriate unless you

3    determine a risk of flight or danger to the community.  Here

4    there is no allegation of any danger to flee.  The actual

5    standard is whether there is a serious risk of flight, not any

6    risk.

7          THE COURT:  Yes.

8          MR. SMITH:  And it's also not a certainty.  It is not

9    an assurance.  It is whether you can be reasonably assured of

10   his appearance as required.  Your obligation is to impose the

11   least --

12         THE COURT:  Counsel, I do these every single week.

13         MR. SMITH:  Okay.

14         THE COURT:  So I don't need you to repeat them to me,

15   although I appreciate it.

16         MR. SMITH:  Okay.  This is -- let's start then with

17   this.  This is not a case involving a presumption of detention.

18   None of the 3142 factors --

19         THE COURT:  No, correct.

20         MR. SMITH:  Bail is the presumption.  Look at the

21   four factors, and you know them.  The first factor, let's look

22   at it.  3142(g) says, look at the nature and circumstances of

23   the offense, including whether the offense is a crime of

24   violence.  It's not.  A violation of 1591.  It's not.  A

25   federal crime of terrorism or involves a minor victim.  It's

1  not.  Controlled substance.  It's not.  Firearm, explosive, or

2  destructive device.  None of those including terms, not one,

3  exists here.

4           THE COURT:  Yes.

5           MR. SMITH:  This is a classic white collar offense,

6  no guns, drugs, no violence.

7           THE COURT:  I agree.

8           MR. SMITH:  Indeed, I understand that the Government,

9  if you look at the offense, they are recommending bond on every

10  other defendant in this case.

11          THE COURT:  I don't have any idea, and that's not my

12  consideration.  I take each defendant at a time.  I have no

13  idea what the other circumstances are as to the other

14  defendants, and I can't factor that in.

15          MR. SMITH:  Yes, Your Honor.

16          THE COURT:  I can only look at this defendant and the

17  conditions that I can fashion.

18          MR. SMITH:  No, I understand.  But looking at the

19  nature of the offense.  The offense hasn't --

20          THE COURT:  Look, most white collar crimes we don't

21  detain people unless we have to.

22          MR. SMITH:  Right.

23          THE COURT:  I understand that.

24          MR. SMITH:  Yeah.

25          THE COURT:  So let's move on.

16

1          MR. SMITH:  But here, even this one, they're not

2     recommending detention on anyone else, just him.

3          THE COURT:  Okay.

4          MR. SMITH:  And it's because of his citizenship and

5     ties, I get that.  Looking at the second factor, the weight of

6     the evidence.  He has given you a proffer, you know, this is

7     all -- all I have is the indictment.  There were, in his

8     description of the factors, I will say, a lot of discussions

9     about what they did and co-conspirators did as opposed to what

10    my client himself supposedly did.

11         I look at the indictment, and this is the weight of

12    the evidence looking at the indictment, look closer at the

13    indictment, this is what it says.  The core of this indictment

14    involves reimportation of medical supplies and over-the-counter

15    pharmaceuticals.

16         The FDA isn't claiming there was any safety issue

17    involved with any of these drugs.  It's purely a fraud case and

18    a money loss case.  The FDA's allegations of fraud are

19    supposedly that the defendants collectively lied and fooled

20    suppliers into selling medical items at deeply discounted rates

21    that they charge for Third World sales by representing that the

22    items wouldn't be sold into the U.S. even though planned to and

23    did sell those at a big profit into the U.S.

24         Another way of characterizing it is that these

25    so-called deep discounts on Third World prices for non-U.S.

1   sales are that the suppliers actually charge a premium -- the

2   pharmaceutical companies charge a premium on U.S. sales.  In

3   political circles, there are certainly some who believe those

4   premiums are unfair to U.S. consumers and that re-importations

5   perhaps even should be allowed.

6          Here the FDA is not only defending those premiums

7   charged on U.S. sales, but it's actually prosecuting these

8   defendants for depriving the so-called victim companies of the

9   extra premiums that U.S. consumers must bear.  That is a

10   political issue, I'll leave it alone.

11          I do not deny that they can -- have a right to

12   prosecute if they can, if they can establish that the sales

13   were perpetrated by fraud.  But let's look at the charges.

14   Look at this document, which is all I can do before I heard the

15   proffer.  The allegations of my own client's actions are not

16   well specified.  The indictment, as I say, talks about what

17   other -- he and other co-conspirators did.

18          THE COURT:  Right.

19          MR. SMITH:  What they supposedly arranged that others

20   -- what he supposedly arranged that others who didn't even --

21   didn't even work in his company -- none of these people are

22   alleged to even work in his company, but in their own separate

23   organizations supposedly did.

24          And at page 5 in paragraph 5 there is an interesting

25   item.  While they're saying that the essence of the fraud is

1   that these defendants supposedly lied about the goods

2   purchased, how they would never be in the U.S., and that the

3   sellers were fooled, paragraph 5 also simultaneously says that

4   they insisted to the sellers that the good had to be -- the

5   goods being shipped had to be labeled and packaged for the U.S.

6   market.  Supposedly they're representing that these are all

7   non-U.S. sales and their simultaneously telling the sellers

8   they had to be labeled and packaged for the U.S. market.

9         That requirement at a minimum, page 5, paragraph 5,

10   seems oddly inconsistent with the FDA's assertion that these

11   defendants were falsely representing that they had no intention

12   of ever selling these goods into the U.S. market.

13         And if you look at the actual wire fraud counts,

14   again, I have to just look at the indictment on page 3, there

15   are only three wire fraud counts.  And while Mr. Javat is

16   charged in all three, the only one that names him directly is

17   Count 3 where the FDA says he e-mailed a price list, e-mailed a

18   prise list, that's the wire fraud count, to a man named G.F.

19   in the United States.  The other two he's not even supposedly

20   on the wires.  How e-mailing a price list rises to the level of

21   wire fraud is not clear to me.

22         Now, look, I recognize that when you have an

23   indictment, you naturally give deference to the grand jury's

24   findings.  I recognize they found probable cause.  But neither

25   do these charges look like a slam dunk kind of case in which

19

1  showing up in Florida is going to be a pointless exercise.

2        From the indictment alone, just looking in the

3  indictment, some defense themes have already naturally emerged.

4  And looking at the weight of the evidence generally, that

5  factor didn't cause, as I say, the Government to seek detention

6  against any of the other co-defendants of this case who

7  similarly are facing $20 million supposedly or $3 million in

8  profits that was lost.

9        Paragraph 9, for example, even talks about how Jim

10 Sipprell and Emanuel George Daskos, but not my client,

11 allegedly removed packaging stickers from certain shipments so

12 that they could be sold into the U.S. market.  Yet Mr. Sipprell

13 was released after his arrest on Monday and he is being allowed

14 to report on his -- to his bond hearing voluntarily.

15       The bottom line on the weight of the evidence is

16 this.  The weight of the evidence as presented doesn't require

17 detention here, especially since this is not even the kind of

18 case that gives rise to a presumption of detention.  So that is

19 factor two.

20       Factor three.  The third factor involving the history

21 and characteristics of the person.  31 --

22       THE COURT:  I know he has no criminal history, I know

23 that.

24       MR. SMITH:  Well, let's go through these because they

25 matter.  And I will try to be as quick as I can, really try and

20

1    be fast.

2          The person's character is the first one.  My client

3    has character witnesses, and we'd love to present them for

4    you --

5          THE COURT:  I accept your representations on that,

6    counsel.  But again, my issue is -- I don't have an issue with

7    anything that you've said so far.

8          MR. SMITH:  Okay.

9          THE COURT:  Especially, I'm not so sure that I agree

10   with you in terms of the assertion more or less that the acts

11   of co-conspirators, I can't impute to this defendant, which

12   I -- this is a conspiracy fraud case.  But the issue that I go

13   back to is who is going to be the third-party custodian and who

14   is going to post a surety bond, that's the issue here.

15         MR. SMITH:  Okay.

16         THE COURT:  Because that's what I'm lacking.  And

17   everything that you say, even if I accept everything you say as

18   true and correct, and I think you are 90 percent of the way

19   there, I don't have an appropriate third-party custodian and I

20   don't have a surety bond in an amount that would be sufficient.

21         MR. SMITH:  Well, if you -- I appreciate that.  Let

22   me try to address them directly.

23         The other custodian besides his wife is Stan Holmes,

24   and the two of them can tag team at least until November.  Ms.

25   Nina Javat would also no doubt request an extension on her visa

1    to allow her to continue to serve as a custodian if necessary.

2             Stan Holmes is here today.  He flew up from Dallas.

3    He is a person who is willing to also even co-sign the bond to

4    the extent of his resources he indicated --

5             THE COURT:  He lives -- yeah, he lives in Dallas.

6             MR. SMITH:  And he's here during the week.  He also,

7    I think, might be willing to put him up in Dallas, but we

8    figured you would want him here, and that makes sense to us as

9    well.

10            THE COURT:  It does no good to have him here when the

11   charges are in Florida.  It does no good to have him in Dallas

12   when the charges are in Florida.

13            MR. SMITH:  Okay.

14            THE COURT:  We have nobody in Florida.

15            MR. SMITH:  Understood.  We would ask that the --

16   Your Honor, in talking to Pretrial, I'm sorry, I think we were

17   seeking to get him a custodian here, and I don't know that the

18   issue of finding him a --

19            THE COURT:  Well, we can do that too, but we've got

20   to deal with getting him back and forth to Florida.  And that's

21   problematic.

22            And I think it's also problematic in that, you know,

23   we've got -- Mr. Holmes said that he would be willing to assist

24   with a secured bond up to 100,000.  But, frankly, that's not

25   enough.  And, you know, if I were someone, I would not sign a

1  secured bond for anyone for millions of dollars, which is what

2  we're looking at here.

3         And it just doesn't work to have a third-party

4  custodian, frankly, who is not living with the defendant.

5         MR. SMITH:  Well, I think --

6         THE COURT:  And I can't find that his wife is a

7  suitable third-party custodian, I cannot.  I don't know exactly

8  what their situation is, their marital situation is, but it is

9  still his wife.  And, you know, I can't assume, especially

10 given her only having the ability to stay in the country right

11 now until November, that there would not, you know, that they

12 couldn't leave together.

13        Electronic monitoring is meaningless, frankly, when

14 we're talking about this sort of thing.  They cut the bracelet

15 off and they're gone.  So that doesn't help.

16        The only thing that would help is a third-party

17 custodian whom I could trust actually living with the

18 defendant, and we're talking about a million at least or more

19 surety bond.  And I don't have those things here.  So this is a

20 problem.

21        That's what my problem boils down to here, is nothing

22 more than that.

23        MR. SMITH:  Well, let me try to address that.

24 Obviously, we can't post the bond until it's set.  I think we

25 could find a way to get to the million dollar surety bond and

23

1    get that posted working with a corporate surety.

2              THE COURT:  Okay.

3              MR. SMITH:  And so, I think that that could be met.

4    In terms of the residency, Stan Holmes is willing to reside

5    with him during the week.  And I guess the --

6              THE COURT:  During the week is not enough.

7              MR. SMITH:  Understood.  And I guess his wife --

8              THE COURT:  Not -- I understand.

9              MR. SMITH:  -- is a British citizen.

10             THE COURT:  But she can only be here until November,

11   and then what happens?

12             MR. SMITH:  Well, I think before then we would need

13   to come to the Court with a suitable alternative, and we would

14   plan to do that.

15             But in terms of releasing him -- I take your point

16   about going to Florida, but between now and November, at most,

17   there are going to be status hearings, he could go down for one

18   day and be back.  I don't think that it's a prohibitor to have

19   him released to be here and then to go to the hearings, and

20   then that we, we would continue --

21             THE COURT:  Putting that aside, who is my third-party

22   custodian?

23             MR. SMITH:  The third-party custodians would be Nina

24   Javat, his wife, and Stan Holmes, who would constantly -- and

25   they are here and they could -- they could vouch for the fact

1   that they will continue to monitor him and serve as custodian.

2   Between that and the electronic monitoring and the surety bond,

3   I think that you can have reasonable assurance that he will

4   show up for court.

5           And let me -- briefly, if I might, just -- his

6   character is impeccable, Your Honor.  We have a Lieutenant

7   General here, Lieutenant General Kicklighter, who is the former

8   Department of Defense Inspector General, ready to vouch for

9   him.

10          We have a former congressman, Bob McEwen from Ohio

11  who is here, again also has known him for many, many years,

12  ready to vouch for him.

13          Stan Holmes, who is from Dallas and is in a ministry,

14  is willing to stay with him and has known him -- again, most of

15  these people have known him like 15 years, they know his

16  family.

17          He has children here in the United States who are

18  going to college.  One who is going to Johns Hopkins, his son.

19  And his daughter, who is going to the Rhode Island School of

20  Design.

21          His character, he has never been charged or even

22  arrested with anything.  He is almost 50 years old.  His family

23  ties are as rock solid as they get.  We would like to put Nina

24  up to say this, but he has been married to one woman for

25  23 years.  They have three children.  As I say, two of them are

25

1    at U.S. universities.  If he were not to show up in Florida, he

2    would never be able to see his kids graduate.  In terms of

3    employment, he has run his business for more than 20 years.

4                    THE COURT:  Where does his wife actually live?  Here?

5                    MR. SMITH:  She lived with him in Dubai, which is

6    where their youngest daughter goes to school.  But she is

7    willing to move here and stay with him and be his custodian as

8    necessary.  The only reason she would go back is to straighten

9    up -- and both daughters are here.  The youngest daughter, I

10   understand, she may have to go to Dubai and her mom may need to

11   stay behind.

12                   But as I say, he has run his company for more than

13   20 years.  Even if you buy everything the Government is saying,

14   there is no suggestion that the first 16, 17 years of that

15   running his business had any issues at all.  So he has the

16   successful long-term business.  He actually has contracts with

17   the Defense Department as well.  He is on the Dunn's list.  His

18   company does business with the Department of Defense.

19                   If he were to abscond, his 2 to $3 million of

20   business that he does with the Defense Department would all go

21   away, all of his contacts, all of his connections and

22   relationships --

23                   THE COURT:  If he is convicted of this --

24                   MR. SMITH:  I'm sorry?

25                   THE COURT:  If he is convicted of this, that will be

1   the result as well.

2          MR. SMITH:  Well, they're here notwithstanding the

3   fact that he has been charged by a grand jury.  So I think that

4   they stand by him.  But I understand the point, that it,

5   obviously, would have an effect.  But he knows for sure that if

6   he were to become a fugitive, everyone is going to absolutely

7   write him off and forever.

8          In terms of his length of residence in the community.

9   Admittedly, he doesn't live in the U.S., but he does coming

10  here frequently.  He has come here for the last 15 years for

11  the National Prayer Breakfast.  He has gotten to know people,

12  he interacts with them.  He actually helps bring people to the

13  National Prayer Breakfast from the Middle East.  He was born in

14  Pakistan.  He provides -- well, he's -- let's just say he's a

15  friend of the United States.  He has been occasionally -- even

16  talks to folks about relationships in the Pakistani/Afghan area

17  we grew -- grew up.

18         His community ties, as I say, his witnesses are

19  substantial.  He is a good friend of the United States.  And

20  his witnesses are not only people that just are -- you know,

21  pass the threshold for being a custodian, they are prominent

22  people who have very stellar reputations and would not stand by

23  him unless they believed in him and didn't know the kinds of

24  help and kind of work that he did.

25         His past conduct is all positive.  He runs a charity,

1    actually, that builds schools in Pakistan where he grew up.

2    His company, as I said, does work, DoD work.   There is no

3    suggestion he ever used any aliases.   There is no suggestion

4    that he attempted to flee when he was stopped.   And in fact,

5    the arresting officer took his Saint Kitts passport and he

6    volunteered, oh, I also have this other passport, Pakistani

7    passport, which he gave to him.   That's the reasons that they

8    have two passports instead of none, is because he volunteered.

9    He was totally cooperative.   No suggestion of an attempt to

10   flee.   Nothing like that.

11          And why would he?   He has never been in trouble.

12   He's always been a law-abiding person.   And these folks that I

13   could bring up would vouch to that, that they believe that he

14   has a character for being a law-abiding citizen.   No criminal

15   history whatsoever.   Never been arrested in almost 50 years.

16          And in terms of his record concerning a court

17   appearance -- his appearance at court hearings, he has never

18   had to appear, but here he was.   He has never absconded, and he

19   certainly wasn't hiding out here in the U.S.

20          In fact, it's interesting, the FDA waited until the

21   end of his trip to arrest him instead of the beginning of his

22   trip.   So the concern that he is somehow out there and that

23   that's a problem or that he is a flight risk, they waited until

24   he was about to leave for Canada even after he had been here in

25   the United States for about eight or nine days before they

28

1  arrested him.

2          Those are all the (A) factors in this third prong.

3  On balance, they all strongly support a bond.

4          And (B) factors are in a different -- you are

5  supposed to look whether he was on probation or parole or other

6  release.  The answer is no.  Those factors strongly support the

7  notion of bail, the history and characteristics of the person.

8          And then the fourth and final factor, of course, asks

9  you to examine the nature and seriousness of the danger if he

10  were to be released.  And nobody is suggesting any danger --

11          THE COURT:  I mean, I know -- that's not -- I know

12  and understand it.

13          MR. SMITH:  So all those factors support -- and of

14  course, the Pretrial officer also is recommending that he get a

15  corporate surety bond.  So we hope that you will go along with

16  that recommendation.

17          The presumption is bail should be given on charges

18  like that.  That presumption is infinitely strong when we're

19  talking about a 45 -- 49-year-old man who has never been

20  accused of anything, with a solid family, many community

21  members willing to speak up on his behalf.  He should not be

22  the only one in this case without a bond.  His decades of life

23  as an upstanding member of the community should count for

24  something.  He shouldn't remain in jail when he is presumed

25  innocent on these charges and there are reasonable assurances

1    he would appear as required.  As all these people who are in

2    court that came today would say, that they believe he would

3    show up for court as required.

4            And that's especially true if you add other

5    conditions, like a secured bond, which we are agreeable to.

6    Secured bond, custodians, electronic monitoring, relinquishment

7    of passports, curfew, you name it, we are willing to comply.

8    We are willing to try to do whatever is necessary to convince

9    you and give you the kind of reasonable assurance you need that

10   he will show up for court in Florida as he is required to do.

11           He has never done anything like not show up for

12   anything in his life, and I don't think he is going to -- he is

13   going start now.

14           THE COURT:  Thank you.  Does the Government have

15   anything to add?

16           MR. REDING:  Your Honor, just briefly.  Just a few

17   things to note.

18           Obviously, his wife is a proposed third-party

19   custodian on a tourist visa here only until November.  I don't

20   think it's workable.  There is also -- what travel documents

21   would he use to move around if he is not in the district that

22   is prosecuting the case?

23           I think there is also a, you know, just a significant

24   flight risk here.  For example, in his Pretrial Preservices

25   interview, he discloses approximately $500,000 in income.

1    However, defense counsel noted in defense contracts alone he's

2    looking at two to $3 million per year.  A quick Internet search

3    showed roughly $10 million in assets in the United States.

4            The third-party custodian that is proposed, Mr. Stan

5    Holmes, is only willing to agree to up to $100,000 in a secured

6    bond.  I will note just in this report alone, that he nearly

7    has $100,000 in cash in U.S. accounts, not including his

8    accounts -- his accounts in foreign jurisdictions.

9            I think there is a significant flight risk.  I

10   believe that the defendant is one private jet away from

11   escaping prosecution.

12           And particularly to address the issue, I don't know

13   specifically about the other co-defendants being released on

14   bond.  I do know that they are U.S. citizens that have ties to

15   the community, unlike the defendant who has no family, no

16   family ties here.  He has very short visits to the United

17   States a few times a year.  I don't believe these are

18   significant community ties.

19           And as -- the overriding theme is he is a foreign

20   national with multiple passports and vast financial resources.

21           THE COURT:  All right, thank you.

22           I agree with virtually everything defense counsel has

23   said about the defendant's danger to the community, his past,

24   you know, not had any other charges ever against him.  He has a

25   lot of people who are willing to stand behind him who are

1   upstanding citizens, certainly.

2          My only concern here is risk of non-appearance.  And

3   I, frankly, think that there are not -- there has not been

4   presented to me -- been to me -- been presented to me

5   conditions that could satisfy that concern.

6          To go through it again, the defendant and his wife

7   both are here just on temporary tourist visas.  His wife can

8   only stay, right now at least, until November.  I can't be

9   assured that she is going to stay past then.  They have a minor

10  child in Pakistan, I guess it is, who is going to school.  I

11  understand he has two children here who are attending college,

12  but, frankly, that's not the kind of draw that I would want.  I

13  mean, that really has -- they're on their own, they're in

14  college.

15         The defendant's employment is directly related to the

16  alleged fraud.  And the main problem that I come back to is

17  even if he could come up with a corporate surety bond of a

18  million or more, I don't have a suitable third-party custodian

19  who could supervise him the way that I believe would have to be

20  done in order to assure his appearance before the Court.

21  Electronic monitoring in this situation is, frankly,

22  meaningless.  I think he has the means and the incentive to

23  flee.

24         And I cannot at this time come up with conditions or

25  a combination of conditions that would satisfy his appearance

32

1    in court.

2            The defendant is remanded to the custody of the

3    Marshal pending trial.

4            MR. SMITH:  Your Honor, might I just briefly, would

5    it be possible for us to request the hearing be continued until

6    Monday, with the hope that maybe we could bring you by on

7    Monday --

8            THE COURT:  You can always bring it back for

9    reconsideration before me.

10           MR. SMITH:  Okay.  I appreciate that.  Thank you,

11   Your Honor.

12           THE COURT:  Okay.  Court stands in recess.

13           NOTE:  The hearing concluded at 2:43 p.m.

14   -------------------------------------------------

15        C E R T I F I C A T E  of  T R A N S C R I P T I O N

16

17           I hereby certify that the foregoing is a true and
     accurate transcript that was typed by me from the recording
18   provided by the court.  Any errors or omissions are due to the
     inability of the undersigned to hear or understand said
19   recording.

20           Further, that I am neither counsel for, related to,
     nor employed by any of the parties to the above-styled action,
21   and that I am not financially or otherwise interested in the
     outcome of the above-styled action.

22

23

24                              /s/ Norman B. Linnell

25                              Norman B. Linnell
                                Court Reporter - USDC/EDVA